UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
------------------------------------------------------X
JAMEL TORRES,

                          Petitioner,                    **OPINION & ORDER**
                                                         **CV-06-0785**

          -against-


HAROLD J. GRAHAM, WARDEN

                          Respondent.
------------------------------------------------------ X
FEUERSTEIN, J.

          On November 20, 2002, a judgment of conviction was entered against petitioner Jamel

Torres (petitioner) in the County Court of the State of New York, Nassau County (Boklan, J.),

upon a jury verdict finding him guilty of murder in the first degree (N.Y. Penal Law §

125.27(1)(a)(vii)), two counts of murder in the second degree (N.Y. Penal Law §§ 125.25(1) and

(3)), two counts of robbery in the first degree (N.Y. Penal Law §§ 160.15(1) and (2)), criminal

possession of a weapon in the second degree (N.Y. Penal Law § 265.03) and criminal possession

of a weapon in the third degree (N.Y. Penal Law § 265.04), and imposition of sentence.  On

February 17, 2006, petitioner filed a petition seeking a writ of habeas corpus pursuant to 28

U.S.C. § 2254.

          For the reasons set forth herein, the petition is denied and the proceeding is dismissed.



I.        BACKGROUND

          A.        Factual Background

The following facts were taken from the trial transcript (T.) and sentencing minutes (S.):

1.     The People's Case

Barbara Schoregge testified that she was employed by On-Line Rentals, which was owned by the victim, Daniel Oscar Pomales (Pomales). (T. 143-144). She testified that at approximately 10:00 a.m. on August 15, 2001, she went to the offices of On-Line Rentals, located in the basement at 229 Jericho Turnpike, Floral Park, New York, and found a body and blood on the floor in one of the offices. (T. 143-149).

Detective Brian Parpan, who is assigned to the Nassau County Police Department (NCPD) Homicide Squad, testified that on August 15, 2001, at approximately 11:15 a.m., he and Detective Richard Lane responded to a homicide at 229 Jericho Turnpike, Floral Park, New York. (T. 488-489). Detective Parpan testified that at the scene, he observed a lot of blood; a male, who was naked except for a tee shirt bunched up around his neck, lying face down in a large pool of blood; and drag marks. (T. 490-491, 493). Detective Laurel Tobias, a member of the NCPD's Crime Scene Search Unit, and Detective Scott Kovar, who is assigned to the Criminalistics Section of the laboratory of the NCPD SIB, testified that footwear impressions were observed in the blood on the floor in the crime scene, as were blood swipes evidencing that something or someone had been dragged on the floor. (Tobias: T. 174-175, 193-195, 212-213; Kovar: T. 745-746). On cross-examination, Detective Tobias testified that it appeared from the condition of the crime scene that a struggle had taken place in the office of On-Line Rentals. (T. 240). Detective Kovar testified that most of the footprint impressions at the scene had concentric circles in the ball and heel region of the outsole consistent with a "court" or basketball-type

2

sneaker, except for one which looked like a boot impression and one which was determined to be from Schoregge's sandal. (T. 747-749, 752, 754-756). Detective Kovar further testified that (1) the sneaker was later determined to be a Nike Air Force One sneaker or an "uptown" sneaker consistent with sneakers petitioner was depicted wearing in photographs submitted to him for comparison; and (2) the boot impression was later determined to be from a Timberland boot "consistent with the design dimension" of a Timberland boot recovered from petitioner. (T. 752, 756-758, 763-766, 823).

Detective Parpan testified that after he observed the scene, he spoke with Ms. Schoregge, who told him: (1) that whenever Pomales was at the office, he would have his car there, which she described as a blue four-door Geo Prism; and (2) that the main way to contact Pomales was via his cellular telephone. (T. 491-492). Detective Parpan testified that since the car was not found at the scene or anywhere in the area, he had his office issue an "alarm" on that vehicle as possibly stolen in the course of a homicide. (T. 491-492). In addition, Detective Parpan testified that he had determined the telephone company which provided cellular service to Pomales and requested a subpoena to get a "dump" on that phone, i.e. a record of all of the incoming and outgoing calls to and from that particular phone. (T. 492).

Detective Parpan further testified that since Pomales's home keys were on the same ring as his car keys, which were missing, and since Pomales's brother lived downstairs in the same residence as Pomales, he had two detectives accompany Pomales's brother home. (T. 493). Detective Parpan testified that he arrived at Pomales's home after 7:00 p.m. on August 15, 2001 and learned that a burglary had already occurred and that a lap top computer and a VCR were missing. (T. 494). Felicita Bracero, a neighbor of Pomales, testified that on August 15, 2001, at

3

approximately 2:00 a.m., she observed a man, whom she identified in a line-up and at trial as petitioner, enter the gate leading to Pomales's house and depart "a few minutes later." (T. 122-127, 133-134, 137-138).

Detective Parpan testified that during the course of his investigation, several items were removed from Pomales's home, including photographs, telephone numbers, pornographic materials, advertisements for gay clubs, and information regarding the missing computer. (T. 494-495). Detective Parpan identified certain photographs depicting petitioner, a piece of paper bearing a telephone number and petitioner's name, and a "machismo male pornographic magazine" with petitioner's pictures in it, as having been recovered from Pomales's apartment. (T. 495-497).

Dr. Andrew Wolodzko, a forensic pathologist employed at the Nassau County Medical Examiner's office, performed the autopsy on Pomales on August 16, 2001 and testified that Pomales had gunshot wounds to his head, left side of his neck, and back; bruises and/or scrapes on his right cheek, neck, right shoulder, wrists, right knee, feet, elbows, and right knuckles and fingers; and a fractured larynx. (T. 321, 323, 325-330). Dr. Wolodzko testified that none of the individual gunshot wounds were immediately fatal and that the cause of death was multiple gunshot wounds of the head, neck and back. (T. 338). Dr. Wolodzko further testified that Pomales "possibly * * * could have survived" had he received prompt medical attention. (T. 338).

Detective Frank H. James, who is assigned to the NCPD SIB Firearms Section, (T. 376), examined the bullets removed from Pomales's body during the autopsy, (T. 379), as well as the four (4) bullets recovered from the crime scene, (James: T. 380; Tobias: T. 173-174, 185-186,

4

197-208), and testified that they all came from the same revolver. (T. 389). In addition, Detective James testified that he examined the gunshot wound to Pomales's forehead and ascertained that it was inflicted from a range of less than three (3) feet and that two (2) of Pomales's other wounds, including one to his neck, were inflicted from a range of less than one foot. (T. 398-399, 416). Moreover, Detective James testified that based upon the appearance of bullet holes only in the back of Pomales's tee shirt and the fold in the fabric, at the time that wound was inflicted, Pomales's shirt was pulled up and his arms were up. (T. 403-406).

Detective Parpan testified that on August 16, 2001, he received information from the "dump" on Pomales's cell phone indicating that the phone was still being used to make outgoing calls. (T. 507-508). According to Detective Parpan, the numbers being dialed from the cell phone showed up on the "dump," so he requested subscriber information from the particular carriers of those numbers. (T. 508). Detective Parpan further testified that from March 1, 2001 until August 14, 2001, there were eight hundred eighty-six (886) phone calls placed from 1001 Woodycrest Avenue, Bronx, New York, where petitioner resided, to Pomales's cell phone. (T. 559-560).

In addition, Detective Parpan testified that he reviewed the telephone records with respect to telephone calls made from and received by the cell phone on August 14, 2001, the day prior to the homicide, and ascertained that four (4) calls were received between 9:51 p.m. and 10:57 p.m. from the telephone number (718) 590-0481, which was assigned to an apartment at 1001 Woodycrest Avenue, Bronx, New York, and that those were the only calls answered by the phone after 8:30 p.m that night. (T. 509-511). Gerry Connell, a custodian of records for Verizon Communications, (T. 422-423), testified that certain records showed more than one outgoing call

from the residence of E. Szigethy, located at 101 Woodycrest Avenue, Bronx, New York 10542 in apartment 6-A, to Pomales's cell phone. (T. 423, 431). Defense counsel stipulated that Ms. Szigethy is the petitioner's maternal grandmother and that petitioner resided with her in August 2001. (T. 432). Detective Parpan testified that the next outgoing call from that phone occurred on August 15, 2001 at 1:49 p.m., to (718) 643-0909, which the subscriber information indicated was assigned to an individual named "Johnson" at 163 Myrtle Avenue, Brooklyn, New York. (T. 511-512).

Detective John Primiano, who is assigned to the NCPD Electronics Squad, (T. 433), testified that he installed a "trap and trace" device on Pomales's cell phone number and that a certain "capture record print-out" was generated from that "trap and trace" device on August 17, 2001. (T. 440-443). Detective Primiano testified that based on those records, he was able to ascertain, *inter alia*, that on August 17, 2001, Pomales's cell phone was utilized in the area of Flatbush Avenue, including within one block of its intersection with Myrtle Avenue, in Brooklyn beginning from approximately 6:20 p.m. up to and including 9:05 p.m. (T. 445-450). Detective Primiano further testified that he received information in "real time," i.e. he was able to intercept the telephone calls at the time they were made. (T. 450).

Detective Parpan testified that in the latter part of the afternoon on August 17, 2001, he received information from the NCPD Electronics Department that Pomales's cell phone had been used over a period of time in a constant location in the vicinity of Flatbush Avenue and Myrtle Avenue in Brooklyn, New York and that the majority of calls made from the phone were to a location at 163 Myrtle Avenue, which is just over a block north of Flatbush Avenue and is the address at which Rasheed Johnson a/k/a Daniel Johnson (Johnson) and Hollis Franklin (Hollis)

6

resided in an apartment. (T. 516). Detective Parpan testified that he responded to the Brooklyn location with Detective Lane shortly after 8:00 p.m. (T. 516-517). Detective Peter Donato, Detective William Brosnan and Detectives O'Connor, Goller and Trujillo also responded to locations near 163 Myrtle Avenue, Brooklyn, New York. (Donato: T. 460-462, 474-475; Brosnan: T. 476). When the detectives arrived at that location they observed a blue four-door 1996 Geo Prism, with license plate number W475XF, parked at the curb. (Donato: T. 461-462; Parpan: T. 517).

Detective Donato testified that after approximately one hour at the location near 163 Myrtle Avenue, he observed two (2) males approaching the vehicle and one of the males, whom he identified as petitioner, appeared to be taking keys out of his pocket. (T. 462-464). Detective Brosnan also identified petitioner as one of two individuals he observed at the scene, (T. 477), and Detective Parpan testified that the other male was later identified as Johnson, (T. 518, 643).

Detective Donato testified that he and Detectives O'Connor and Goller exited their vehicle to apprehend petitioner and Johnson. (T. 464-465, 467-468). When he arrived at the vehicle, petitioner was already seated in the driver's seat behind the steering wheel. (T. 469). On cross-examination, Detective Donato testified that when he got to the vehicle, he opened the driver's door with his left hand, identified himself as a police officer and ordered petitioner to exit the vehicle. (T. 470). He further testified that he had his gun drawn and pointed at petitioner at the time. (T. 470). Detective Donato testified that after petitioner had exited the vehicle, he grabbed him by one arm, guided him toward the rear of the car and asked him to put his hands up against the car and to spread his feet back, which petitioner did, dropping the car keys he had been holding on the trunk of the car. (T. 471). Detective Brosnan then reached around

7

petitioner's waistband and removed and secured a cellular telephone. (Donato: T. 471-472; Brosnan: T. 478). Detective Brosnan testified that he checked the number in that telephone and determined that it was the same telephone number as Pomales's cell phone and that he also dismantled the phone when he returned to headquarters to check the serial number in the phone against Pomales's phone records and ascertained that it was Pomales's telephone. (T. 480-481).

After patting petitioner down, Detective Donato then handcuffed him and placed him in the right rear seat of an unmarked car driven by Detective Lane. (T. 471-473). Detective Parpan entered the driver's side rear seat of that unmarked vehicle. (Donato: T. 473; Parpan: T. 520). Detective Parpan testified that he orally advised petitioner of his rights during the ride from Brooklyn to Nassau County and that petitioner indicated that he understood those rights and wanted to speak anyway. (T. 520-521). According to Detective Parpan, petitioner indicated that he was an informant for Bronx Parole, he had been a member of the "Bloods" gang, he resided at 1001 Woodycrest Avenue in the Bronx with his grandparents, he was a model in Latin clubs, he was not gay, and that Johnson was gay and was a "bad guy" who dealt in stolen credit cards. (T. 521-524). In addition, Detective Parpan testified that petitioner initially denied ever having been to Long Island, but then corrected himself and stated that he had recently been out in East Hampton briefly to work with rap music. (T. 522-523). Detective Parpan further testified that petitioner stated that the car from which he was arrested was Johnson's and that Johnson let him use it, but he did not respond to Detective Parpan's inquiry as to why he had been driving it at the time of the arrest. (T. 523). In addition, Detective Parpan testified that petitioner stated that he had found the cell phone removed from his belt, but he could not be more specific as to when or where he found it, other than to state that it had been several days earlier. (T. 523).

8

Detective Parpan testified that when they arrived at headquarters he accompanied petitioner to the main interview room, uncuffed him and told him to empty his pockets. (T. 525). He further testified that among the items petitioner removed from his pockets were four (4) credit cards in Pomales's name or in the name of his company On-Line Rentals. (T. 526-529). Detective Parpan testified that petitioner was then fingerprinted and returned to an interview room where Detective Parpan again advised him of his rights and asked him to read and sign a rights card, which petitioner did. (T. 530-533). Petitioner then made a statement indicating that Johnson was the one who knew "Danny" (Pomales); he did not even know him (Pomales); and that Johnson and Hollis, Johnson's "boyfriend," were the two who knew "Pomales" because they were gay. (T. 534-535, 624). According to Detective Parpan, prior to that statement, Pomales's name had never been mentioned. (T. 534-535, 624). Detective Parpan testified that petitioner initially denied knowing, ever having called, or ever having any contact with Pomales, but then admitted that he had been at Pomales's house twice and that he had known Pomales for a couple of weeks. (T. 534-535). Detective Parpan testified that after he told petitioner that his story did not make sense because Pomales's credit cards, car keys and cell phone had been recovered from petitioner, petitioner "sat for a little while" and then "went into his version of what took place the night of [August] 14th, into the morning hours of the 15th." (T. 535).

According to Detective Parpan, petitioner told him that he was at Johnson's house at six o'clock the night of August 14th when Johnson asked him to "do some business for him," i.e. to rob somebody to make some money, to which petitioner agreed. (T. 536). Petitioner then stated that they stayed at Johnson's house until about eleven o'clock that night, at which time they got into Johnson's black Lincoln LSC and drove to Nassau County. (T. 536). Petitioner stated that

when they arrived at Pomales's house, he stayed in the Lincoln while Johnson exited the vehicle, went into the house, remained inside for about twenty (20) minutes, then returned to the vehicle and said they were going to where Pomales worked. (T. 536-537). Petitioner then stated that Johnson drove to an area in Nassau County with which petitioner was unfamiliar and parked by a main street; that Pomales's blue four-door Geo Prism pulled into the driveway of a place of business; that Johnson exited the Lincoln, told petitioner to stay where he was and entered the building; that petitioner stayed in the Lincoln listening to music; and that Johnson returned to the car approximately forty-five (45) minutes later, produced a gun from his waistband, gave the gun to petitioner and told petitioner to go downstairs and kill and rob Pomales. (T. 537). Detective Parpan testified that petitioner stated that he did what Johnson asked because he was afraid of Johnson and he would get money for doing so. (T. 538). Petitioner then stated that he walked downstairs, saw Pomales in designer shorts and a tee shirt and shot Pomales twice when he turned his back on petitioner; then, when Pomales stood up again, he aimed the gun at Pomales's head and emptied the gun with four (4) more rounds and when Pomales again got up he chased and tackled him, ripping Pomales's underwear off. (T. 538-539). Petitioner then stated that when he was able to control Pomales, he dragged him into the room where his body was found; wiped himself off with towels he found in the office; then he took off all of his clothing, including his Nike sneakers, and put on Pomales's clothing, including his Timberland boots, blue jeans and a tee shirt; and he tried to wipe off a bloody print he had left on the wall with one of the towels. (T. 539-540). Petitioner stated that he then took the bloody towels and the gun and placed them in plastic garbage bags he found at the scene; he took Pomales's wallet, car keys and cell phone; he exited the building; and he took Pomales's Geo Prism and followed Johnson back

10

to Pomales's house. (T. 540-541). According to petitioner, when they arrived at Pomales's house, Johnson told him to go inside and take whatever he could and that he did go inside and took a laptop computer and a VCR; then he drove the Geo behind Johnson back to Brooklyn. (T. 541). Petitioner told Detective Parpan that when they returned to Johnson's apartment, he changed his clothes again and left all of Pomales's clothes, the towels and the gun with Johnson, then he took four hundred dollars ($400.00) in cash, the cell phone, the car keys and the Geo and went home. (T. 541-542). Petitioner also told Detective Parpan that he had purchased five hundred dollars ($500.00) to six hundred dollars ($600.00) worth of clothing from Macy's and a computer from Staples with Pomales's credit cards. (T. 542-543).

Detective Parpan reduced petitioner's oral statement to a written statement, which he testified was consistent with petitioner's oral statement except insofar as petitioner indicated he was not at Johnson's residence at 6:00 p.m., but rather had called him at that time. (T. 543-551, 601-602). According to Detective Parpan, petitioner read and signed the written statement as modified. (T. 543-551, 601-602).

Nathalie Thomas testified that in August 2001, she was employed in a Staples store on Flatbush Avenue in Brooklyn as operations manager. (T. 789). She testified that on August 17, 2001 at approximately 6:45 p.m. she sold a Compaq computer to a tall, light-skinned African-American male with a tattoo on his neck and corn rows in his hair, who purchased it using a Staples business corporate credit card in the name of On-Line Rentals. (T. 790-793, 797). She identified petitioner as the purchaser. (T. 790-793, 797).

Fred Klein, an assistant district attorney in the Nassau County District Attorney's Office, testified that he conducted a videotaped interview of petitioner on August 18, 2001, which was

11

played for the jury. (T. 705, 709-710).

Brandon Huston testified that he met petitioner at the Nassau County Jail, where he was incarcerated for grand larceny, on or about August 19, 2001 and had certain conversations with petitioner approximately two (2) weeks later. (T. 828, 866). Huston testified that during one of the conversations, petitioner told him that he was in jail for the murder of "a guy that he knew, Danny Pomales" and described him as "sort of like his friend." (T. 829). According to Huston, petitioner told him that "[Pomales] had a real estate business in the Poconos. * * * He helped [Pomales] out with a lot of stuff, like his permit," and that "[Pomales] was gay. He [petitioner] thought that maybe [Pomales] might like him in that type of way." (T. 829). In addition, Huston testified that petitioner told him "about how he got the idea of killing Danny Pomales. * * * [O]ne night they were at [Pomales's] house. [Pomales] was serving food and * * * he saw that [Pomales] was sprinkling something on his food. He said he wasn't sure if it was a poison to kill him, or like a date rape drug, to have his way with him, seeing as how he [Pomales] was gay. He said that when he saw that, and he sat down to eat, he made sure that he ate around where the drug was put, so that he wouldn't eat any of it. So he figured from there, that he was going to have revenge, and that he was going to kill [Pomales]." (T. 829-830). Huston further testified that petitioner told him that two to three weeks later, he lured Pomales into thinking he was interested in him sexually and went to Pomales's place of work, where Pomales danced for him on the table and started to strip. (T. 830-831). According to Huston, petitioner told him that once Pomales was naked, petitioner shot him in the back, but that didn't kill him; so he shot him in the head and mouth and a couple of more times, but Pomales still didn't die; so he grabbed Pomales and choked him and he finally died. (T. 831). Huston testified that petitioner then told

12

him that he collected all of Pomales's clothes, his wallet with credit cards and his cell phone and drove Pomales's car to his house, where he took some more items. (T. 831). Huston further testified that petitioner asked him to help him create an alibi and to frame Johnson and Hollis. (T. 832-833). On cross-examination, Huston testified to his criminal history and that he told his attorney about his conversations with petitioner in June 2002, after a subsequent arrest, in the hope of avoiding being upstate, as opposed to a local, incarceration. (T. 835-862).

At the close of the People's case, the defense moved for a trial order of dismissal as to all counts, which was denied. (T. 870).

### 2. The Defense

Petitioner testified in his own defense. Petitioner testified that he resided at 1001 Woodycrest Avenue, Bronx, New York with his grandparents, Escuelita Hudson a/k/a Escuelita Szigethy and Gerard Szigethy, prior to his arrest. (T. 872, 877). Petitioner also testified that he was convicted of rape in the first degree and to the circumstances underlying that conviction: that he was a high school basketball player who met a female in school and the two of them were "indulging one another on a communication level. Things transpired, to a sexual sense, But things got out of hand." (T. 874-877). Petitioner testified that he served four (4) years of an indeterminate sentence of three (3) to six (6) years in an adult prison facility upstate for the rape conviction and that he was released on September 22, 2000, when he was twenty-one (21) years old, and was assigned to the Bronx Division of Parole. (T. 874-877). Petitioner testified that after his release from prison, he modeled, signed with a record label as a music writer and performer, stripped in various clubs in Manhattan and New Jersey, and posed for various

13

pornographic magazines. (T. 878-883).

Petitioner testified that he met Hollis in 1995; that Hollis was an "overseer" to the House of Prada and was his "modeling father"; and that he met Johnson in or around March 2001 at Hollis's apartment, which he shared with Johnson. (T. 913-914).

Petitioner testified that he knew Pomales only as Danny Rodriguez and that he met Pomales through Hollis in November 2000 at a studio session. (T. 884, 886). Petitioner further testified that he met with Pomales more frequently toward the end of 2000 and into the year 2001, because he assisted Pomales with "electrical trades" during Pomales's refurbishment of the basement of his business and certain houses that he rented in the Poconos, and that Pomales eventually gave petitioner his phone number. (T. 888-891). Petitioner denied any romantic involvement with Pomales. (T. 890). Petitioner testified that in early 2001, he knew where Pomales's office was located and that he had been to his home "a lot". (T. 891, 894). He also testified that he first went to the Poconos with Pomales in January 2001 and that thereafter he went to the Poconos with Pomales "a lot of times." (T. 892).

Petitioner testified that in August 2001, he alternated living between his grandmother's residence and an Indian reservation in Shinnecock, Long Island and he had "very frequent" contact with Pomales, about twice a week, usually in the Poconos. (T. 894-895, 901-902).

Petitioner testified that on August 17, 2001, "in the early part of the afternoon," he took the train from his home to Hollis's and Johnson's apartment and that both Hollis and Johnson were present when he arrived. (T. 915). He testified that at some point in time, Hollis had gone to the gym and petitioner left the apartment with Johnson. (T. 916, 918). According to petitioner, he and Johnson intended to go to a restaurant down the block, but Johnson wanted to

14

put the computer in the trunk of a sky blue 1996 Geo Prism so he handed petitioner the car keys and told him to pop the trunk, because that was the only way to open the trunk, and petitioner started to get into the driver's side of that vehicle. (T. 918-919). He testified that at the time he got into the vehicle, he had a pager, his house keys, his wallet and one thousand one hundred thirteen dollars and fifty-five cents ($1,113.55) on his person and Johnson was carrying a Compaq Presario computer. (T. 917). Petitioner denied ever having a cell phone on him, except for the one included in his pager. (T. 951). Petitioner testified that when he opened the car door, before he even got in the car, he heard someone shout "freeze" and then there were "about twenty guns in [his] face." (T. 919-920). Petitioner testified that at the time he was stopped, he had the car keys to the Geo Prism on his person. (T. 921). Petitioner further testified that after the officers stopped him, one of the officers, whom he later learned was Detective Donato, rammed his body into the car, went through his pockets and knocked his pager, which he used as an informant for Bronx Parole, to the floor, while other officers frisked him and asked him were the gun was. (T. 921-922). Petitioner testified that after the officers frisked him, they handcuffed him and walked him to an unmarked car and that while he was walking toward the car, he told Detective Donato that he was an "undercover investigator" and Detective Donato started punching him in the back of the head proclaiming that he hated "CI's. (T. 923).

Petitioner testified that during the drive to the precinct, he told Detective Parpan that he was an undercover investigator investigating Johnson for "credit cards, extortion, possible major drug trafficking and gun trafficking." (T. 925, 938-939). According to petitioner, Detective Parpan told him to "sit back and shut the fuck up. Who you work for is my least concern." (T. 925). Petitioner testified that Detective Parpan then asked him where the gun was and that after

15

petitioner told him he did not have a gun and asked why he was being arrested, Detective Parpan punched him in the lower stomach and asked him what gang he was with. (T. 926-927). Petitioner testified that he denied being associated with a gang and again denied possessing a gun and Detective Parpan said "I'm going to make sure you scum bags go to jail for what you did * * *," to which petitioner responded that he did not shoot anybody. (T. 926-928). According to petitioner, Detective Parpan responded "you're right. You didn't shoot nobody. You killed somebody." (T. 928). Petitioner testified that Detective Parpan then told him that Johnson was "telling everything" in the other car and that whoever cooperated first the officers "will walk * * * to the end." (T. 926-927, 933, 947-948). Petitioner testified that Detective Parpan did not mention any names, locations, or which law enforcement agency he was with at that time and did not advise him of his rights, but continued to question him and told him that the police had evidence, prints and a witness that place petitioner at the scene of the crime. (T. 927-929, 936, 948).

Petitioner testified that at some point during the drive to Long Island, Detective Parpan asked him if he did drugs and if he was high, to which petitioner responded in the affirmative saying that he was high on marijuana and Ecstasy. (T. 930). Petitioner testified that Detective Parpan never responded to his inquiries regarding who was killed, when he was killed or who said petitioner was involved in the killing. (T. 930-931, 937). Petitioner further testified that he told Detective Parpan that during his investigation of Johnson, he observed Johnson use credit cards at Macy's and to purchase a computer at Staples and that the credit card he used at Staples was in the name of On-Line Rentals. (T. 939-940). Petitioner denied knowing, or ever hearing, of On-Line Rentals prior to that time and testified that he knew Pomales's business as "Rent to

16

Go." (T. 940). Petitioner further testified that when Detective Parpan asked him "Who killed Oscar Pomale [sic]?", petitioner responded that he did not know anybody by that name and that he did not kill anybody. (T. 941-942). According to petitioner, Detective Parpan refused his request to call his parole officer or his uncle, whom petitioner advised was an officer for Internal Affairs in New York City, and made a mockery of his mother's and brother's murders, which caused petitioner to become upset. (T. 943-946, 948-949).

Petitioner testified that after they arrived at the precinct, the handcuffs were removed and he was strip-searched, fingerprinted and interviewed by Detective Parpan. (T. 960). Petitioner testified that at the start of the interview, when he again denied knowing "Oscar Pomales," Detective Parpan lunged at him, pulled his hair, slammed his head on the table, put his left arm into his right jaw bone and told petitioner that Johnson had already told them everything. (T. 973-975). Petitioner further testified that when Detective Parpan told him that he had been caught with Pomales's car, petitioner told him that the car belonged to Danny Rodriguez, then he described Rodriguez and told Detective Parpan where he lived and what he did for a living. (T. 975-976). According to petitioner, Detective Parpan then asked him where, when and how petitioner had met "Rodriguez," but he never inquired as to petitioner's relationship with him. (T. 976-977). Petitioner testified that when Detective Parpan asked him how he got Pomales's car, petitioner said that he never had it; rather Johnson had the car because "Danny" let him borrow it when he went to the Poconos and Johnson had driven petitioner to Staples. (T. 977-978). Petitioner further testified that he told Detective Parpan that he had been to Pomales's home and place of business many times and Detective Parpan told him he was lying because Johnson said he only knew Pomales for two weeks. (T. 979-980). Petitioner testified that

Detective Parpan again refused his request to call his parole officer or uncle and told him that he could not call anyone until petitioner told him what he wanted to hear. (T. 981). Petitioner further testified that Detective Lane then brought in a card setting out the Miranda rights, which Detective Parpan did not read to petitioner before he asked petitioner to sign it and that when petitioner started to read the card, Detective Parpan slapped him in the head. (T. 985-987). Petitioner testified that he signed the card without reading it. (T. 987-988).

Petitioner testified that Detective Parpan then questioned him about his relationship with Johnson and asked why he believed Johnson was setting him up. (T. 989-1007). According to petitioner, he believed Johnson was setting him up because he found out petitioner was investigating him and Hollis and was responsible for Johnson's cousin being convicted of murder and attempted robbery and because Hollis "was overly obsessed with [him], and very jealous about everybody in [his] surrounding[s]." (T. 1008-1009).

Petitioner testified that when he refused to sign the written statement handed to him by Detective Parpan, Detective Parpan hit him in the head with a telephone book then grabbed him by the back of his neck and told him to sign the statement or he would show Johnson the statement on how petitioner claimed Johnson had forced him into killing Pomales. (T. 1015-1019). Petitioner testified that he then signed the statement without completely reading it. (T. 1019-1021). Petitioner further testified that after he signed the statement, Detective Parpan made him read it out loud in front of Detective Lane seven (7) times. (T. 1021-1022). Petitioner testified that Detective Parpan also threatened to hurt him if he did not say that it was he who had killed Pomales and promised him that nothing bad would happen to him if he indicated that he had been treated well. (T. 1026-1027, 1030-1032, 1037). According to petitioner, he was

18

handcuffed to a chair during the entire interview. (T. 1038).

On cross-examination, petitioner testified that Detectives Parpan and Brosnan lied regarding the property they recovered from his person, that Detective Parpan framed him for the murder, and that Detective Parpan coerced Nathalie, from Staples, to lie. (T. 1054-1058, 1090). Petitioner further testified that he was nervous, cautious and scared in the presence of Detective Parpan, although he also testified that he was "not scared of no one." (T. 1085).

In addition, petitioner was questioned on cross-examination regarding his conviction, upon a plea of guilty, for rape in the first degree. (T. 1058-1073). When petitioner denied raping the victim in that case, the prosecutor questioned petitioner regarding the underlying facts of the conviction and read petitioner's plea allocution. (T. 1059-1073). Petitioner testified that the statements he made in court on October 18, 1996, during his plea allocution, were not the truth. (T. 1073-1074). According to petitioner, he did not lie to the court; rather the Legal Aid Society lied to the court and he was misguided by the Legal Aid Society. (T. 1073). Over defense counsel's objection, (T. 1075-1078), the trial court permitted the prosecutor to inquire about petitioner's admission during a sex offender program. (T. 1078). Petitioner testified that he admitted to rape in the first degree during that program because it was a requirement of the program in order to obtain a conditional release, otherwise he would have had to do his maximum sentence. (T. 1079). Petitioner denied that he committed the crime of rape in the first degree and admitted that he lied in accepting responsibility for the crime during the sex offender program in order to obtain conditional release. (T. 1080-1081).

Petitioner further testified on cross-examination that he had been to Pomales's place of business around fifteen (15) times and admitted that certain exhibits depicted the name "On-Line

19

Rentals" at the business. (T. 1093-1094).

In addition, petitioner testified that he was housed on the same floor in the Nassau County Jail as Brandon Huston, whom he knows as "Astro," but that he never discussed his case with him because they were associated with rival gangs, petitioner was associated with the "Bloods," and Huston was a "Nietta." (T. 1095-1098, 1103). However, petitioner admitted that certain statements attributed to him by Huston were accurate, although he indicated that Detective Parpan told him what to say. (T. 1098-1105).

Following the above testimony, defense counsel moved for a competency examination of petitioner pursuant to N.Y. C.P.L. § 730.30, in light of the "numerous outbursts through the course of the trial * * *; numerous statements made by [petitioner], in some respects, that were not only incoherent, but almost bordering on delusional." (T. 1108-1109). The trial court denied the application with leave to renew on the basis that petitioner "knows very well what's going on;" understood the roles of the judge, defense counsel and the prosecutor; was able to assist in his defense; and displayed no evidence of incompetency. (T. 1111-1112).

On further cross-examination, petitioner testified that he provided more details to Assistant District Attorney Klein during his videotaped statement than was provided in his written statement, which he claims was manufactured by Detective Parpan, because Detective Parpan had told him to provide "sensible answers" during the videotaped interview. (T. 1120-1142).

Petitioner admitted on cross-examination that he and Pomales were good friends, that he made over eight hundred eighty-six (886) telephone calls to Pomales between March 2001 and the date of the murder, and that he had been to the Poconos with Pomales and to Pomales's

20

apartment many times and had been to Pomales's office around fifteen (15) times. (T. 1142-1144, 1146). He denied any romantic relationship with Pomales. (T. 1144).

On re-direct examination, petitioner admitted to owning many pairs of Nike Air Force One sneakers and Timberland boots. (T. 1158).

At the close of all the evidence, defense counsel renewed all of his previous applications. (T. 1163-1164). The trial court again denied defense counsel's motion to dismiss. (T. 1164).


3.    Verdict and Sentence

The jury found petitioner guilty of murder in the first degree, two counts of murder in the second degree, two counts of robbery in the first degree, criminal possession of a weapon in the second degree, and criminal possession of a weapon in the third degree. (T. 1293-1294). Prior to sentencing, defense counsel moved pursuant to N.Y. C.P.L. § 330.30 to set aside the verdict based on the alleged incapacity of petitioner. (S. 10-11). The trial court denied that application on the basis that there was no indication that petitioner was not competent to understand the nature of the charges against him or to assist in his defense. (S. 11). On November 20, 2002, a judgment of conviction was entered against petitioner in the County Court, Nassau County (Boklan, J.), upon the jury verdict and imposition of sentence to concurrent terms of imprisonment of life without the possibility of parole for the conviction of murder in the first degree, twenty-five (25) years to life for the convictions of murder in the second degree, twenty-five (25) years for the convictions of robbery in the first degree, fifteen (15) years for the conviction of criminal possession of a weapon in the second degree, and seven (7) years for the conviction of criminal possession of a weapon in the third degree. (S. 15).

21

B.    Procedural History

Petitioner appealed the judgment of conviction to the Supreme Court of the State of New York, Appellate Division, Second Judicial Department on the grounds, *inter alia*: (1) that the statements he made to law enforcement officials should have been suppressed; (2) that his trial counsel was ineffective for failing to timely move for a competency hearing pursuant to N.Y. C.P.L. § 730.30; (3) that the trial court's ruling pursuant to People v. Sandoval, 34 N.Y.2d 371, 378, 357 N.Y.S.2d 849, 314 N.E.2d 413, allowing the prosecutor to question him on cross-examination regarding his prior rape conviction, deprived him of a fair trial; (4) that the trial court erred in denying petitioner's motion for a "sequential double-blind" lineup; (5) that the evidence was legally insufficient and the verdict was against the weight of the evidence; and (6) that the trial court's denial of petitioner's counsel's request for an extension of time for voir dire denied him the selection of an impartial jury.  On November 15, 2004, the Appellate Division, Second Department affirmed the judgment of conviction, finding, *inter alia*, that petitioner's statements were voluntary; that the trial court providently exercised its discretion in denying petitioner's motion for a "sequential double-blind" lineup; that petitioner's challenge to the legal sufficiency of the evidence was unpreserved and, in any event, was without merit; that the verdict was not against the weight of the evidence; that petitioner failed to meet his burden of demonstrating that the prejudicial effect of the evidence of his prior rape conviction so outweighed the probative worth of that evidence so as to warrant its exclusion; that petitioner received meaningful representation at trial; and that petitioner's remaining contentions were either unpreserved, without merit, or involved matters dehor the record.  People v. Torres, 12 A.D.3d 539, 786 N.Y.S.2d 61 (N.Y. App.Div. 2004).  On January 14, 2005, the Court of Appeals

22

denied leave to appeal the order of the Appellate Division. People v. Torres, 4 N.Y.3d 768, 792 N.Y.S.2d 12, 825 N.E.2d 144 (2005). Thus, petitioner's judgment of conviction became final on April 14, 2005, when his time expired to seek direct review by writ of certiorari to the United States Supreme Court. See Rule 13(1) of the Rules of the Supreme Court of the United States; 28 U.S.C. § 2101(d).

On or about February 17, 2006, petitioner filed this petition for a writ of habeas corpus pursuant to 28 U.S.C. § 2254, alleging (1) that his trial counsel was ineffective for failing to timely move for a competency hearing pursuant to N.Y. C.P.L. § 730.30; (2) that the trial court's Sandoval ruling deprived him of a fair trial; (3) that the prosecution failed to prove his guilt beyond a reasonable doubt and the verdict was against the weight of the evidence; and (4) that the trial court's denial of his trial counsel's motion for an extension of time for voir dire denied him an impartial jury. Respondent filed his return on May 25, 2006.

On April 4, 2006, petitioner moved in the County Court, Nassau County pursuant to N.Y. C.P.L. §§ 440.10 and 440.30 to vacate his conviction on the ground that his psychiatric condition prevented him from participating in his defense (the 440.10 motion). By order dated June 28, 2006, the County Court (Carter, J.) summarily denied petitioner's motion finding, inter alia, that petitioner's claim was "totally without merit." The County Court stated that it had "examined the voluminous record and [was] satisfied that the issue was dealt with properly at trial." In addition, the County Court noted that the Appellate Division, on direct appeal, had found that the trial court had "providently exercised its discretion" in denying defense counsel's motion for a competency examination of petitioner and had "properly relied on its own observations of, and interaction with, the [petitioner] in concluding that there was no reasonable ground to believe

23

that he was an incapacitated person."

By letter dated July 12, 2006 addressed to the Appellate Division, Second Department, petitioner requested a thirty (30) day extension of time to seek leave to appeal the June 28, 2006 order. By letter dated August 14, 2006 addressed to the Appellate Division, petitioner again sought an extension of time to seek leave to appeal. By letter dated January 11, 2007, the Appellate Division advised petitioner that it could not consider his application for leave to appeal absent a copy of the order appealed from, the moving papers that were before the trial court and an application seeking leave to appeal "supported by a statement of the reasons why the application should be granted." By letter dated February 22, 2007 addressed to the Appellate Division, petitioner enclosed an application for leave to appeal the June 28, 2006 and admitted that his application was untimely, but he did not again seek an extension of time within which to seek leave to appeal.

Thereafter, petitioner moved for an order staying this proceeding and holding it in abeyance pending his exhaustion of the issue of whether his trial counsel was ineffective for failing to timely investigate, obtain and use his psychiatric records and to secure a competency hearing pursuant to N.Y. C.P.L. § 730.30. By opinion and order dated April 20, 2007, petitioner's motion for a stay was granted and petitioner was granted leave to amend his petition to assert an ineffective assistance of trial counsel issue for his trial counsel's purported failure to timely investigate his psychiatric history. Petitioner filed an amended petition in accordance with that order on May 7, 2007.

By letter dated August 10, 2007, the Appellate Division advised petitioner that it had no record of an application for leave to appeal the 440.10 motion having been filed by petitioner nor

24

of any other letters having had been filed by petitioner after January 2005. Thereafter, by letter application dated August 14, 2007, petitioner requested that the stay in this proceeding be vacated and the Court proceed on his original habeas petition. By order dated August 24, 2007, petitioner's application was granted and the stay was vacated. By order dated September 21, 2007, the government was directed to file a response to the amended petition within forty-five (45) days. The government filed its response in accordance with that order.[1]

II.    DISCUSSION

    A.    The AEDPA

        1.    Exhaustion

The Anti-Terrorism and Effective Death Penalty Act (AEDPA), 28 U.S.C. § 2254, governs applications of incarcerated state court defendants seeking federal habeas corpus relief. The AEDPA requires that prior to bringing a petition for habeas corpus relief in federal court, a petitioner "exhaust the remedies available in state court or demonstrate that 'there is an absence of available State corrective process [or] [that] circumstances exist that render such process ineffective to protect the rights of the [petitioner].'" Fama v. Commissioner of Correctional Services, 235 F.3d 804, 808 (2d Cir.2000)(citation omitted, insertion in original). The exhaustion requirement mandates that the petitioner "fairly present" both the factual and legal premises of his federal claim to the highest state court. Baldwin v. Reese, 541 U.S. 27, 124

---

[1] Notwithstanding the order vacating the stay at petitioner's request and the government's filing of a response to the amended petition, by letter dated March 3, 2008, petitioner advised the Court of his attempts to exhaust his new claim and by letter dated May 27, 2008, petitioner advised the Court that his application for leave to appeal the denial of his 440.10 motion had been denied by order dated May 19, 2008.

S.Ct. 1347, 158 L.Ed. 2d 64 (2004); see also McKinney v. Artuz, 326 F.3d 87, 96-97 (2d Cir. 2003); see also Strogov v. Attorney General of State of New York, 191 F.3d 188, 191 (2d Cir. 1999) (holding that a federal constitutional claim has not been fairly presented to the State courts unless the petitioner has informed those courts of all of the essential factual allegations and essentially the same legal doctrine he asserts in his federal petition). In order to have fairly presented a claim to the state court, the petitioner "must have set forth in state court all of the essential factual allegations asserted in his federal petition; if material factual allegations were omitted, the state court has not had a fair opportunity to rule on the claim." Dorsey v. Kelly, 112 F.3d 50, 52 (2d Cir. 1997) (quoting Daye v. Attorney General of State of New York, 696 F.2d 186, 191 (2d Cir. 1982)). "When a state prisoner presents a materially different claim and stronger evidentiary case before the federal court in a habeas corpus petition, and a state forum is available to consider the additional factors and varied claim, the federal court should properly dismiss the petition before it [as unexhausted]." Norwood v. Hanslmaier, No. 93 CV 3748, 1997 WL 67669, at * 4 (E.D.N.Y. Feb. 11, 1997) (citing United States ex rel. Figueroa v. McMann, 411 F.2d 915, 916 (2d Cir. 1969)).

It is undisputed that all of the claims petitioner raises in his original habeas petition have been exhausted. However, the new claim raised in the amended petition relating to the ineffective assistance of petitioner's trial counsel for his alleged failure to adequately investigate petitioner's mental competence has not been exhausted since petitioner failed to supply the state courts with numerous documents on which he relied in support of his claim and, thus, he cannot be said to have "fairly presented" that claim to the state court. See, e.g. United States ex rel. Boodie v. Herold, 349 F.2d 372, 373 (2d Cir. 1965) (finding that the petitioner had not exhausted

his ineffective assistance of counsel claim where his claims were based in large part on matters that were not before the state courts and, thus, the state courts had not been given the opportunity to pass upon the alleged denial of counsel in light of a full record); Charon v. Greiner, No. 97 CV 2114, 1999 WL 477248, at * 1 (E.D.N.Y. July 6, 1999) (holding that if material allegations were omitted, the state court has not had a fair opportunity to rule on the claim (quoting Daye, 696 F.2d at 191)).[2]

Since the claim asserted in the amended petition is unexhausted, the amended petition is a "mixed" petition containing both exhausted and unexhausted claims. In cases involving petitions containing both exhausted and unexhausted claims, a federal district court may (1) stay the proceeding until such time as the petitioner has returned to state court and exhausted his previously unexhausted claims; (2) dismiss the "mixed" petition, without prejudice, until the claims have been exhausted in state court, unless the claims could not be raised following

---

[2] A federal habeas corpus petition which contains unexhausted claims should be dismissed, Bossett v. Walker, 41 F.3d 825, 828 (2d Cir. 1994), unless there is no longer a state forum available to a petitioner to present his constitutional claim, in which case the federal court shall deem the claim exhausted and deny the claim as if the state court had considered but denied the claim on the basis of a state procedural rule which the petitioner had failed to follow. Coleman v. Thompson, 501 U.S. 722, 727, 111 S.Ct. 2546, 115 L.Ed.2d 640 (1991). Petitioner's ineffective assistance of trial counsel claim based on a failure to investigate cannot be deemed to be exhausted since petitioner is not procedurally barred by state law from filing a successive 440.10 motion incorporating the factual allegations omitted in the first motion and included in the amended habeas petition. N.Y. C.P.L. § 440.10(3)(c) provides that a state court "may deny" a successive motion to vacate where the defendant should have raised the issue on the prior motion; however, such denials are discretionary and, thus, do not impose an absolute bar on successive motions. See Bonilla v. Portuondo, No. 00 Civ. 2369, 2004 WL 350694, at * 15 (S.D.N.Y. Feb. 26, 2004) (citing cases), report and recommendation adopted by, 2004 WL 1782174 (S.D.N.Y. Aug. 9, 2004). Moreover, petitioner's claim is based on matters that do not appear in the record of the criminal proceedings and, thus, petitioner would not be precluded under N.Y. C.P.L. § 440.10(2)(c) from bringing a motion to vacate based on his failure to raise the claim on direct appeal.

exhaustion pursuant to the AEDPA's one-year statute of limitations; (3) give petitioner an

opportunity to withdraw the unexhausted claim or claims; or (4) deny the petition on the merits.

See Rhines v. Weber, 544 U.S. 269, 125 S.Ct. 1528, 1533, 1535, 161 L.Ed.2d 440 (2005),

Gandarilla v. Artuz, 322 F.3d 182, 186 (2d Cir. 2003). Although petitioner was initially granted

a stay in order to exhaust his claim of ineffective of assistance of counsel based on a failure to

investigate, the stay was subsequently vacated at his request. Dismissal of the petition is not an

option, since petitioner's exhausted claims would be time-barred under the AEDPA. Rather than

providing petitioner an opportunity to withdraw his unexhausted claim, which would further

delay this proceeding, I opt to deny petitioner's petition on the merits for the reasons set forth

below.

2.     Standard of Review

Pursuant to 28 U. S. C. 2254 (d) an application for a writ of habeas corpus that has met the

procedural prerequisites

> shall not be granted with respect to any claim that was adjudicated on the merits in
> State court proceedings unless the adjudication of the claim—
> (1) resulted in a decision that was contrary to, or involved an unreasonable
> application of, clearly established Federal law, as determined by the Supreme Court
> of the United States; or (2) resulted in a decision that was based on an unreasonable
> determination of the facts in light of the evidence presented in the State court
> proceeding.

§ 2254(d). "An 'adjudication on the merits' is one that '(1) disposes of the claim on the merits, and

(2) reduces its disposition to judgment.'" Bell v. Miller, 500 F.3d 149, 155 (2d Cir. 2007) (citing

Sellan v. Kuhlman, 261 F.3d 303, 312 (2d Cir. 2001)); see also Spears v. Greiner, 459 F.3d 200, 203

(2d Cir. 2006) (accord).

28

Once claims have been adjudicated on the merits, "a federal habeas court may grant the writ if the state court arrives at a conclusion opposite to that reached by [the Supreme] Court on a question of law or if the state court decides a case differently than [the Supreme] Court has on a set of materially indistinguishable facts." Williams v. Taylor, 529 U.S. 362, 412-13, 120 S.Ct. 1495, 145 L.Ed.2d 389 (2000); 28 U.S.C. 2254 (d)(1). Alternatively, "a federal habeas court may grant the writ if the state court identifies the correct governing legal principle from [the Supreme] Court's decisions but unreasonably applies that principle to the facts of [a] prisoner's case." Williams, 529 U.S. at 413, 120 S.Ct. 1495; 28 U.S.C. 2254 (d)(1). Under this standard, "a federal habeas court may not issue the writ simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly. Rather, that application must also be unreasonable." Williams, 529 U.S. at 411, 120 S.Ct. 1495; Gilchrist v. O'Keefe, 260 F.3d 87, 93 (2d Cir. 2001). Under the AEDPA, determination of the factual issues made by a state court "shall be presumed to be correct," and the applicant "shall have the burden of rebutting the presumption of correctness by clear and convincing evidence." § 2254(e)(1).

B.    Ineffective Assistance of Trial Counsel

In order to prevail on a Sixth Amendment claim, a petitioner must prove both that counsel's representation "fell below an objective standard of reasonableness" measured under "prevailing professional norms," and that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." Strickland v. Washington, 466 U.S. 668, 694, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984).

Although it is beyond cavil that the "criminal trial of an incompetent defendant violates due

process," <u>Medina v. California</u>, 505 U.S. 437, 453, 112 S.Ct. 2572, 120 L.Ed.2d 353 (1992), petitioner does not allege that the trial court erred in denying his defense counsel's request for a competency hearing. Rather, petitioner claims that his trial counsel was ineffective in failing to raise the issue of his competency earlier than mid-trial and in failing to investigate his psychiatric history[3].

Petitioner presented his claim of ineffective assistance of trial counsel based on his counsel's failure to earlier move for a competency examination to the Appellate Division on direct appeal, which found that petitioner "received meaningful representation." <u>People v. Torres</u>, 12 A.D.3d at 540, 786 N.Y.S.2d 61. Under the AEDPA, the trial court's decision is presumed to be correct, <u>see</u> <u>Rice v. Collins</u>, 546 U.S. 333, 126 S.Ct. 969, 974, 163 L.Ed.2d 824 (2006) (holding that state-court factual findings are presumed correct and that petitioner has the burden of rebutting the presumption by clear and convincing evidence), and petitioner has not rebutted the findings of the trial court by clear and convincing evidence. Moreover, the Appellate Division's finding is not contrary to, or an unreasonable application of, the <u>Strickland</u> standard.

Generally, simple disagreements over trial strategies or tactics are not sufficient by themselves to establish ineffectiveness. <u>Singleton v. Duncan</u>, No. 03-CV-561, 2006 WL 73734, at * 14 (E.D.N.Y. Jan. 10, 2006); <u>People v. Flores</u>, 84 N.Y.2d 184, 187, 615 N.Y.S.2d 662, 639 N.E.2d 19, (1994). "Among the 'virtually unchallengeable' tactical decisions left to the judgment of trial counsel are determinations regarding the defense strategy adopted at trial." <u>Gluzman v. United States</u>, 124 F.Supp.2d 171, 174 (S.D.N.Y. 2000) (citing <u>United States v. Simmons</u>, 923 F.2d 934,

---

[3] Petitioner contends that the psychiatric records from the Mental Health Department of the Nassau County Jail would have revealed that he had been treated in the psychiatric center for approximately one year; had been prescribed anti-depressive drugs, which he took on a daily basis; and was under the influence of "psychiatric medications" throughout the trial, including when he testified on his own behalf.

956 (2d Cir. 1991)); see also Henry v. Poole, 409 F.3d 48, 63 (2d Cir. 2005) (holding that strategic choices made by counsel after thorough investigation are virtually unchallengeable and even strategic choices made after less than complete investigation do not amount to ineffective assistance so long as the known facts made it reasonable to believe that further investigation was not necessary). There is "a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." Strickland, 466 U.S. at 689, 104 S.Ct. 2052. Petitioner has not met his burden of overcoming the presumption that, under the circumstances, the failure of his trial counsel to earlier move for a competency hearing "might be considered sound trial strategy." Id. (quoting Michel v. Louisiana, 350 U.S. 91, 101 (1955)). Thus, defense counsel's decision to wait until petitioner testified before seeking a competency hearing in insufficient to establish his ineffectiveness.

In any event, petitioner has not demonstrated that he was prejudiced by his trial counsel's failure to more fully investigate his purported incompetency or to raise the issue of his incompetency at an earlier stage in the trial. Under New York law, an "'[i]ncapacitated person' means a defendant who as a result of mental disease or defect lacks capacity to understand the proceedings against him or to assist in his own defense." N.Y. C.P.L. § 730.10(1). Similarly, in determining a defendant's competency to stand trial under federal law, the "test must be whether [the defendant] has sufficient present ability to consult with his lawyer with a reasonable degree of rational understanding and whether he has a rational as well as factual understanding of the proceedings against him." Dusky v. United States, 362 U.S. 402, 404, 80 S.Ct. 788, 4 L.Ed.2d 824 (1960). The trial transcript reveals that petitioner was fully capable of understanding the proceedings and of assisting in his own defense. The state court's determination in this regard, i.e. that there was no reasonable ground to

31

believe that petitioner was an incapacitated person, which was based on its observation of, and interaction with, petitioner during the criminal proceedings, is entitled to deference on habeas review. See United States v. Vamos, 797 F.2d 1146, 1150 (2d Cir. 1986); see also Harris v. Kuhlmann, 346 F.3d 330, 355 (2d Cir. 2003). Moreover, "given the absence of evidence indicating that petitioner's competency was in doubt, failure of counsel to seek a competency determination does not constitute ineffective assistance of counsel." Hernandez v. United States, 839 F.Supp. 140, 145 (E.D.N.Y. 1993); see also Kohler v. Kelly, 890 F.Supp. 207, 213 (W.D.N.Y. 1994) (holding that in order to prove that counsel erred in failing to pursue questions of the petitioner's competency, the record must show some evidence indicating that the petitioner's competency was in doubt), aff'd, 58 F.3d 58 (2d Cir. 1995); Dennis v. Turner, 729 F.Supp. 15, 17 (S.D.N.Y. 1990) (holding that given the absence of any evidence indicating that the petitioner's competency was in doubt at the time of trial, his trial counsel will not be presumed to have represented the petitioner deficiently in failing to request a competency hearing); Andrews v. Kelly, No. 86 Civ. 0908, 1987 WL 16157, at * 4 (S.D.N.Y. Aug. 11, 1987) (holding that since the record gave ample evidence of the petitioner's competence to proceed, there was no basis for claiming that his defense counsel's failure to investigate psychiatric claims on behalf of petitioner amounted to deficient performance). Therefore, there is not a reasonable probability that the court would have granted an earlier request by defense counsel for a competency hearing or that the outcome of the proceeding would have been different has defense counsel moved earlier for a hearing or more fully investigated petitioner's psychiatric history. See, e.g. Etoria v. Bennett, 292 F.Supp.2d 456, 472 (E.D.N.Y. 2003) (finding the petitioner's contention that he was denied the effective assistance of trial counsel because his trial counsel failed to more fully investigate his potential incompetency to be without merit where, *inter*

*alia*, the transcripts of pretrial hearings and the trial itself revealed the petitioner to be capable of understanding the proceedings and of assisting in his own defense). Accordingly, habeas relief is not warranted with respect to petitioner's claims of ineffective assistance of counsel.

C.    <u>Sandoval</u> Ruling

Prior to the trial, the trial court conducted a <u>Sandoval</u> hearing to determine whether the People would be permitted to inquire of petitioner, should he take the stand, regarding a prior conviction, upon his plea of guilty, of rape in the first degree in 1996 and its underlying acts. (T. 11-15). After hearing arguments from both sides, the trial court ruled that the People were permitted to inquire as to that conviction and its underlying acts. (T. 15).

"The <u>Sandoval</u> ruling is a matter of state law as to the admissibility of evidence, the purpose of which is to provide the defendant with a prospective ruling on the possible use of defendant's prior bad acts by the prosecution for the purpose of impeachment." <u>Ayala v. Ercole</u>, No. 06-CV-1747, 2007 WL 1135560, at * 14 (E.D.N.Y. Apr. 17, 2007). Since the admission of a prior conviction is an evidentiary ruling, it "is only redressable in a federal habeas corpus proceeding if there is a showing that the particular errors were of constitutional magnitude. * * *. [Citation omitted]. Evidentiary errors must be 'so pervasive as to have denied [petitioner] a fundamentally fair trial." <u>Hunter v. Greiner</u>, No. 99 CIV. 4191, 2000 WL 245864, at * 4 (S.D.N.Y. Mar. 3, 2000) (quoting <u>Collins v. Scully</u>, 755 F.2d 16, 18 (2d Cir. 1985)); <u>see also Ayala</u>, 2007 WL 1135560, at * 14 (holding that federal habeas courts are limited to the review of state court convictions where there has been a constitutional error so great that the criminal defendant was denied a fair trial * *

33

* and that a writ of habeas corpus should issue only where the petitioner can show that the evidentiary error deprived him of a fundamentally fair trial); <u>William v. Greiner</u>, No. 02-CV-1116, 03-MISC-0066, 2003 WL 23198759, at * 11 (E.D.N.Y. Nov. 26, 2003) (holding that generally, state court rulings on evidentiary matters, including rulings on the permissible extent of cross-examination should the defendant testify, are a matter of state law that do not raise constitutional issues and are not reviewable by a federal habeas court unless the errors alleged are so prejudicial as to constitute fundamental unfairness). "The standard is 'whether the erroneously admitted evidence, viewed objectively in light of the entire record before the jury, was sufficiently material to provide the basis for conviction or to remove a reasonable doubt that would have existed on the record without it. In short it must have been crucial, critical, highly significant.'" <u>Smith v. Greiner</u>, No. 99-CV-5230, 03-MISC-0066, 2003 WL 24015053, at * 4 (E.D.N.Y. Sept. 15, 2003), <u>aff'd</u>, 117 Fed.Appx. 779 (2d Cir. 2004) (citing <u>Collins v. Scully</u>, 755 F.2d 16, 19 (2d Cir. 1985).

Since petitioner testified at trial, his <u>Sandoval</u> claim is cognizable on habeas review. <u>Cf.</u> <u>Luce v. United States</u>, 469 U.S. 38, 43, 105 S.Ct. 460, 83 L.Ed.2d 443 (1984) (holding that in order to raise a claim of improper impeachment with a prior conviction, the petitioner must have testified at trial). The trial court did not abuse its discretion under state law in allowing the prosecution to cross-examine petitioner regarding his prior conviction for rape in the first degree, since the prior commission of that crime revealed "a willingness or disposition on the part of [petitioner] voluntarily to place the advancement of his individual self-interest ahead of principle or of the interests of society," <u>Sandoval</u>, 314 N.E.2d at 417-418, and, thus, was "relevant to suggest his readiness to do so again on the witness stand." <u>Id.</u>; <u>see also</u> <u>People v. Johnson</u>, 283 A.D.2d 331, 724 N.Y.S.2d 857 (1st Dept. 2001) (holding that the defendant's prior rape conviction was probative of his willingness

to place his individual self-interest ahead of the interest of society); People v. Singletary, 116 A.D.2d 604, 605, 497 N.Y.S.2d 466 (2d Dept. 1986) (holding that crimes such as rape and robbery are highly probative as to a defendant's willingness to place his self-interest ahead of principle or of the interest of society). A review of the transcript of the proceedings demonstrates that the trial court properly weighed the probative value of the conviction for assessing petitioner's credibility against the potential for undue prejudice to petitioner resulting therefrom and that the ruling was reasonable and not constitutional error.

In any event, the admission of evidence of that prior conviction, which was elicited in such degree on cross-examination as a result of petitioner's evasiveness and refusal to be forthright in responding to the prosecutor's questions, was not of such a constitutional magnitude so as to violate petitioner's constitutional right to a fair trial, particularly in light of the overwhelming evidence of petitioner's guilt.

       D.     Sufficiency of Evidence

           1.     Weight of the Evidence Claim

Petitioner's claim that the verdict was against the weight of the evidence does not present a federal constitutional issue. See Rodriguez v. O'Keefe, No. 96 Civ. 2094, 1996 WL 428164, at * 4 (S.D.N.Y. Jul. 31, 1996), aff'd, 122 F.3d 1057 (2d Cir. 1997); see also Ramos v. Phillips, No. 05 CV 0023, 2005 WL 1541046, at * 6 (E.D.N.Y. June 30, 2005)(holding that a "weight of the evidence" claim is not cognizable in a federal habeas court); Correa v. Duncan, 172 F.Supp.2d 378, 381 (E.D.N.Y. 2001)(holding that because a "weight of the evidence" claim is a pure state law claim, a federal court is precluded by 28 U.S.C. § 2254[a] from considering the claim). Accordingly, this

Court is precluded from considering petitioner's "weight of the evidence" claim.

### 2.    Legal Sufficiency Claim

A federal court may not review a state prisoner's federal claims if the claims were denied in state court pursuant to an independent and adequate state procedural rule, "unless the prisoner can demonstrate cause for the default and actual prejudice as a result of the alleged violation of federal law, or demonstrate that failure to consider the claims will result in a fundamental miscarriage of justice." Coleman v. Thompson, 501 U.S. 722, 749-750, 111 S.Ct. 2546, 115 L.Ed.2d 640 (1991). In order for federal habeas review to be procedurally defaulted, the state court's reliance on state law must be "clear from the face of the opinion." Fama, 235 F.3d at 809 (internal quotations and citation omitted). If a state court holding contains a plain statement that a claim is procedurally defaulted then the federal habeas court may not review it, even if the state court also rejected the claim on the merits in the alternative. See Harris v. Reed, 489 U.S. 255, 264 n.10, 109 S.Ct. 1038, 103 L.Ed.2d 308 (1989) ("a state court need not fear reaching the merits of a federal claim in an *alternative* holding" so long as it explicitly invokes a state procedural rule as a separate basis for its decision). When a state court says that a claim is "not preserved for appellate review" and then rules "in any event" on the merits, such a claim is procedurally defaulted. See Green v. Travis, 414 F.3d 288, 294 (2d Cir. 2005).

The Appellate Division, Second Department rejected petitioner's legal sufficiency claim on appeal as "unpreserved for appellate review" pursuant to N.Y. C.P.L. § 470.05(2), then ruled that, in any event, that claim was without merit since the evidence, viewed in the light most favorable to the prosecution, "was legally sufficient to establish the [petitioner's] guilt beyond a reasonable

doubt." People v. Torres, 12 A.D.3d at 540, 786 N.Y.S.2d 61. Since the Appellate Division clearly invoked a state procedural rules as a basis for its rejection of petitioner's legal sufficiency claim, and petitioner has not alleged cause for the default, actual prejudice, or that it would be a fundamental miscarriage of justice if that claim were not reviewed, that claim is barred from federal habeas review.

E.    Voir Dire

Prior to the trial, the trial court advised counsel that it had "a strict time limit on voir dire. [The trial court's] voir dire is fairly long. Then * * * each [counsel] have fifteen minutes, every round. That's it." (T. 5). The trial court reiterated immediately prior to voir dire that counsel for each side would have "exactly" fifteen minutes, each round, for voir dire. (T. 19-20). The trial court denied defense counsel's application to increase the time limit for voir dire. (T. 20).

The authority of a federal habeas court to review a state court's voir dire proceeding "is limited to enforcing the commands of the United States Constitution." Mu'Min v. Virginia, 500 U.S. 415, 422, 111 S.Ct. 1899, 114 L.Ed.2d 493 (1991). "The constitutional standard of fairness requires that a criminal defendant have 'a panel of impartial, indifferent jurors.'" Mitchell v. Herbert, No. 97 CIV. 5128, 1998 WL 186766, at * 2 (S.D.N.Y. Apr. 20, 1998) (quoting Murphy v. Florida, 421 U.S. 794, 799-800, 95 S.Ct. 2031, 44 L.Ed.2d 589 (1975)). However, the Sixth Amendment right to a trial free of prejudice "is not a license to 'propound any question' nor does it mean that 'limitless time must be devoted to preliminary voir dire.'" St. Lawrence v. Scully, 523 F.Supp. 1290, 1297 (S.D.N.Y. 1981) (quoting Ham v. South Carolina, 409 U.S. 524, 533, 93 S.Ct. 848, 853, 35 L.Ed.2d 46 (1973) (Marshall, J., concurring in part and dissenting in part)), aff'd, 697 F.2d 296 (2d Cir. 1982). In order to prevail on a claim regarding a defect in jury selection, a petitioner "must

establish the actual partiality of the jury that convicted him." United States v. Quinones, 511 F.3d 289, 306 (2d Cir. 2007); see also United States v. Perez, 387 F.3d 201, 207 (2d Cir. 2004) (holding that to succeed on a constitutional challenge based on an error during voir dire, the petitioner must show that his conviction was at the hands of a biased jury); United States v. Rubin, 37 F.3d 49, 54 (2d Cir. 1994) (holding that to prevail on a claim of error during voir dire, the petitioner must establish that the jury that eventually convicted him was not impartial).

"The conduct and content of the voir dire are entrusted to the broad discretion of the trial judge." U.S. v. Maldonado-Rivera, 922 F.2d 934, 970 (2d Cir. 1990). "A district court is 'accorded ample discretion in determining how best to conduct * * * voir dire.'" United States v. Lawes, 292 F.3d 123, 128 (2d Cir. 2002) (quoting Rosales-Lopez v. United States, 451 U.S. 182, 189, 101 S.Ct. 1629, 68 L.Ed.2d 22 (1981)); see also Quinones, 511 F.3d at 299 (accord).

Petitioner has not established that the jury that convicted him was not impartial or that he otherwise suffered any actual prejudice as a result of the trial court's limitation of voir dire, particularly since he did not even exercise all of his peremptory challenges. The trial court's limiting of the attorneys' voir dire questioning to fifteen (15) minutes each round did not render petitioner's trial so fundamentally unfair as to violate petitioner's constitutional right to an impartial jury. See, e.g. Maldonado-Rivera, 922 F.2d at 971 (holding that voir dire questioning was not unduly curtailed where the court, *inter alia*, orally questioned the prospective jurors, permitted the attorneys to submit proposed supplemental questions and allowed each attorney to further question the prospective jurors for fifteen minutes). Defense counsel was afforded a full and fair opportunity to question all prospective jurors on voir dire, and there is no indication in the record that defense counsel was precluded from questioning any juror about any subject due to lack of time. See, e.g. Id. (finding

that the defendant was "afforded an appropriate opportunity to ferret out prejudices and excuse potentially biased jurors, and that there [was] no basis for believing that the procedures were not adequate to ensure an unbiased jury"). Accordingly, habeas relief is not warranted on petitioner's voir dire claim.

III.    CONCLUSION

The petition for a writ of habeas corpus is denied in its entirety and the proceeding is dismissed. Since petitioner has failed to make a substantial showing of a denial of a constitutional right, a certificate of appealability will not issue. 28 U.S.C. § 2253; see also Miller-El v. Cockrell, 537 U.S. 322, 336, 123 S.Ct. 1029, 154 L.Ed.2d 931 (2003); Luciadore v. New York State Div. of Parole, 209 F.3d 107, 112 (2d Cir. 2000); Kellogg v. Strack, 269 F.3d 100, 102 (2d Cir. 2001). Petitioner has a right to seek a certificate of appealability from the Court of Appeals for the Second Circuit. See, 28 U.S.C. § 2253. The Clerk of the Court is directed to close this case.

SO ORDERED.

_____
SANDRA J. FEUERSTEIN
United States District Judge

Dated: June 9, 2008
          Central Islip, New York

Copies to:

Jamel Torres, *pro se*
02A6511
Auburn Correctional Facility
P.O. Box 618
Auburn, New York 13024